**FIRST PASADENA STATE BANK,**
**Appellant,**

v.

**George C. MARQUETTE, Jr., Appellee.**

**No. 15028.**

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Jan. 25, 1968.

Rehearing Denied March 21, 1968.

———◇———

Fulbright, Crooker, Freeman, Bates & Jaworski, Austin C. Wilson, Houston, Baskin & Eakes, Stanley D. Baskin, John M. Fakes, Pasadena, for appellant.

Bryan, Suhr, Bering & Bailey, William G. Fox, Houston, for appellee.

BELL, Chief Justice.

This is an appeal from a judgment against appellant in the amount of $55,101.22, based on breach of contract implied in fact. $35,658.58 represents the principal amount found by the jury to be due because of the contract, and $19,442.64 represents interest thereon to the date of judgment.

In September, 1954, appellee entered into a written contract with Deer Park Independent School District to furnish all labor and material for the construction of a junior high school building, and of a shop addition to the High School. On October 19, 1954, Lonnie Wallace, owner of Allen Plumbing Company, by written contract with appellee, agreed to furnish all material and labor in performing a designated portion of the contract. Under the contract Wallace, as subcontractor, was to receive payment on the 15th of each month for 85% of the work done and materials furnished during the previous month.

Each month, beginning in November, 1954, Wallace would compile a written estimate of what was due from appellee for work done the previous month. The first estimate in November was presented by him directly to appellee, and after it was verified by appellee's estimator and after the School District had paid appellee his estimate, he paid Wallace. After this estimate, however, Wallace arranged with appellant to finance his work on the job. The financing was effected by Wallace's assigning his estimate each month to appellant. The appellant would send an executed copy of the assignment together with the estimate to appellee. After each estimate was verified by appellee's estimator and after the School District had paid appellee his estimate, appellee would pay the estimate by check payable to Allen Plumbing Company (Wallace) and appellant. The check was transmitted to appellant, who cashed it and thus was repaid the loan it had made Wallace on the estimate plus interest. Each assignment by Wallace gave authority to appellant to endorse checks payable to Wallace.

Appellant's connection began with Estimate #2, dated December 3, 1954. Wallace executed an assignment of it to appellant. The assignment, as did all others, contained the language, "and within the knowledge of the undersigned such account, claim or demand is just and true and there are no just and lawful offsets, payments or credits to be allowed thereon. * * *" The assignments were sworn to by Wallace. Appellant through its then president, Mr. Reed, would transmit a copy of each assignment and estimate to appellee. The letter of transmittal, after reciting the transmittal of the assignment, would contain the direction, "You will please be governed according to the terms of this assignment."

It should be noted that the estimates assigned contained an enumeration of work done and material furnished, but, with two or three exceptions, contained no information concerning who the suppliers of the materials were.

The last assignment paid was in July, 1955. It had come to light in June that Wallace had not been paying for all the materials. Appellee subsequently had to pay the suppliers, and this suit against appellant resulted.

Trial was on appellee's Sixth Amended Original Petition. The petition recited in substance what we have stated above: de-

tailed the various estimates that included materials and work contained on them that had allegedly been paid for but which were not paid for, and asserted that together with Wallace's sworn account and the appellant's transmittal letter, these constituted a representation by appellant that such work and mateiral had been paid for or would be paid for. He alleged that he, in reliance upon such representations, paid in full the amounts shown by the estimates to appellant.

The petition further alleged that Mr. Reed, acting for and with the authority of appellant, as an inducement for appellee to pay the money to the appellant, *agreed* with appellee that appellant *would agree* that the amounts shown on said estimates would be paid for in consideration of appellee's paying to appellant the total amount of the estimates when presented. In reliance on such representation and *agreements* by appellant, it is alleged, appellee made such payments in full and he was damaged, as above stated, as a result of appellant's failing and refusing to carry out its *agreements and breaching its contract* with appellee. The alleged representation, assurance and agreements by Mr. Reed were that all amounts specified in the estimates would be paid to the suppliers and appellee would suffer no damage or harm by paying the estimate to the appellant.

In the alternative, appellee relied on the theory of fraud by appellant in making the representations.

Appellant in its answer, apart from a special exception which seems to have been waived because not acted on, pled a general denial, various special denials, the statute of limitation and the statute of frauds, Article 3995, Subdivision 2.

The court submitted the case to the jury on special issues encompassing the theory of liability because of a contract implied in fact and on the theory of false representations by Mr. Reed that payments of all amounts shown to be due on each estimate had been made.

The jury answered as to each issue based on false representations, separate issues being submitted as to each estimate, that it did not find from a preponderance of the evidence that Mr. Reed represented to appellee, prior to payment by appellee, that payment of all amounts shown to be due on the estimate had been made. This exonerated appellant from liability on this theory.

Appellee had paid appellant six estimates that included claims by Wallace for work and material done or furnished. It later developed that as to such estimates some of the suppliers of the material had not been paid. The court submitted an issue as to an implied agreement between appellee and appellant that appellant would pay for any such unpaid items. An illustration of the issue submitted as to each estimate is Issue No. 1, reading as follows: "Do you find from a preponderance of the evidence that at the time Plaintiff made payment to the bank the amount shown to be due on estimate no. 2, said bank, acting through M. F. Reed, impliedly agreed to apply the proceeds to the payment of the work described in the estimate?"

There was then an issue following inquiring as to the amount of the estimate that had not been paid by the bank or Wallace.

The court gave the following definition of "impliedly agreed": " * * * by the term impliedly agreed is meant where the intention in regard to the subject-matter is not manifest by explicit or direct words, but is gathered by implication or necessary deduction from the circumstances, the general language and conduct of the parties."

Appellant complains that neither the pleadings nor the evidence support recovery under the theory of implied contract and the court erred in submitting the definition and issues on such theory, Too, it says in any

event, recovery is barred by the statute of frauds.

██ We are of the view that appellee's pleading, though somewhat inarticulately drawn, sufficiently, in the absence of special exception, states a cause of action based on contract implied in fact. We feel the reasonable inference may be drawn from the pleading, considering all the allegations, that there was an implied agreement that if the full amount of the estimates was paid to appellant, it would pay any suppliers of the materials out of the proceeds of the estimates, if any, that had not been paid. While the term "impliedly" is not used, such is not essential. The use of the term "agreed", depending on all the other facts and circumstances alleged, will support a recovery based on implied contract or express contract. Ricks v. Smith, 204 S.W.2d 12 (Tex.Civ.App.), Ref., n. r. e. Here the petition when construed as a whole shows appellee was relying on the estimate, the assignment, the letter of transmittal by the bank, the demand for payment of the full amount of each estimate and Mr. Reed's representations and agreement that all amounts specified in the estimates would be paid to the suppliers and appellee would suffer no harm or damage by paying the estimates to the bank.

The objection to the submission of the issues on the ground that there was no pleading of implied contract is overruled.

██ However, we are of the view that there was no evidence of probative force to evidence an implied agreement that appellant would apply the amount of the proceeds of the estimates to the payment of any work described in said estimates. The objections to the submission of said issues were, therefore, good.

We have above stated the evidence with regard to the assignments, the estimates and the letter of transmittal. There is certainly nothing in them to evidence an intent that if any suppliers had not been paid the appellant would pay them. In fact who

the suppliers were was not shown on the estimate except for two. The estimates really described the work done on the job and what was due from appellee. The assignment directed payment to the appellant which had bought the assignment. It did contain the affidavit of Wallace which was a representation to the bank that there were no offsets. The bank then sent the executed assignment or copy to appellee. However, these, and the transmittal letter, were merely a claim to the payments assigned to it.

There was oral testimony from Mrs. Marquette who handled all the bookkeeping. Also Mr. Marquette testified briefly.

Mrs. Marquette testified that when she got the first assignment (Estimate No. 2), she called Mr. Reed whom she had known since she was a small girl. She had never seen an assignment of this nature and she asked him, "What was the type of this assignment?" He told her not to worry, the estimate and everything on it was paid and appellee owed nobody but the bank and there were no lawful offsets and if appellee did not pay the bank it would have a lien on the job. He told her that three or four times. She said when he told her the bank had bought "these" and that "they" were paid for she believed him and "from then on it would be the same thing all the way through." In reliance on what Mr. Reed told her, she sent the check for the estimate. When the January 14, 1955, assignment came she didn't remember whether she called or not, but she paid it according to what Mr. Reed said the first time. She called Mr. Reed again in February and discussed "these assignments that were coming in." "He again told me that he was buying these assignments from Lonnie Wallace. I owed nobody but the bank. *That the bank was seeing that the bills were being paid and they were advancing the money to Mr. Wallace so that he could take the discount and make himself some extra money and he said from now on every time I send one in with that letter*

*and this assignment I had to make it to the bank."* If payment was not made to the bank Mr. Reed said, "The bank will have a right to file a lien against your job because *you owe us the money. We have advanced him the money and bought this assignment and you owe us the money."* (emphasis ours)

When Estimate No. 9 came in in June, there was a claim for some "Amervent" heaters. *She knew Mr. Reed had already told her * * * he was buying and paying for the assignments.* She told him the heaters were not on the job and she could not put the estimate through for payment. He told her he had bought and paid for the *estimate and he would see that all the bills were paid when the heaters got on the job.* He assured her he would see that the heaters got on the job. He told her when she got the money from the School System to send the bank a check.

On cross-examination, Mrs. Marquette stated that in the conversation with Mr. Reed when Estimate No. 2 came in, *he told her the bank had already paid Allen Plumbing the estimate money.*

Mr. Marquette testified he talked to Mr. Reed in June about the heaters not being on the job. Mr. Reed said he would see they got on the job *and would see that they were paid for.* Mr. Marquette told Mr. Reed he had been depending on the bank letters and the assignments that said everything had been paid. *Reed said, "Don't worry, George, everything will be paid."* (Emphasis added.) If Mr. Reed had not said that, he would never have released the check for this June estimate.

Mr. Kirschke, the estimator for appellee, was not present at trial, but part of his testimony given at a previous trial was read. He believed he talked to Mr. Reed in December, 1954, about the letter from the bank. *Mr. Reed told him the bank had loaned money to Wallace so Wallace could discount various bills on the job.* Further

Reed said the bank had advanced the money to Wallace; that the bills had been discounted and that Marquette at that time owed the bank.

Mr. Reed testified Wallace applied for a loan and was to use the estimates from the appellee to secure the loan. The money was advanced by the bank at the time the assignment was made. The bank would send the assignment to appellee and would get the money about a month later. This would repay the money advanced with interest. He had several conversations with Mrs. Marquette, the first, as he recalled, was in December, 1954, when the first assignment was made. He told her about the assignment and about sending the money to the bank. As he recalled, he told her they had paid Wallace the money and for her to send the money to the bank. He denied that he told her the bank would see that Allen Plumbing Company's bills were paid. He knew nothing of what people Wallace owed money to or "who the bills were paid to." When he sent the assignment, the estimate and letter of transmittal, he intended to request payment from appellee. The bank received payment. He never knew who the suppliers of the materials were. In fact, the estimates showed only Bell and Gossett. He was relying on what Wallace told him about there being no offsets.

Of course, there may be in law a contract that will be implied in fact where under all facts and circumstances the reasonable mind would conclude that the parties had mutually agreed for a consideration that one or both of them would do a particular thing. The real difference between such an implied contract and an express one is in the manner of proof. In an express contract there are words expressly used by the parties that expressly agree what each will do. In a contract implied in fact there are no express agreements, but from all facts and circumstances an intention to agree may be found. The principles are discussed in the following authorities:

17 C.J.S. Contracts § 4b, p. 557 et seq.; 13 Tex.Jur.2d, Sec. 5, p. 113 et seq.; Stone Company, Inc. v. Carminati, 317 S.W.2d 78 (Tex.Civ.App.), n. w. h.; Biggs and Co. v. Lokey, 62 S.W.2d 665 (Tex.Civ.App.), dism.; First National Bank of Kosse v. Shaw, 260 S.W. 309 (Tex.Civ.App.), n. w. h.

Appellee, through his agents, knew the appellant advanced money and took the assignment of the amounts due under the estimates to repay itself. It relied on the affidavit of Wallace that there were no offsets due. Even under the testimony of appellee's witnesses the most, under all the circumstances, that could reasonably be implied is that if there were any offsets because of unpaid bills that the bank would see that they were paid. It may not be reasonably implied that the bank would pay the bills out of the proceeds of the estimates because all parties knew the bank was looking to the proceeds to repay itself the money it had advanced Wallace.

If it can be said it can be implied that the bank agreed to pay the bills if Wallace didn't, it is nothing more than an agreement to answer for the debts, defaults and miscarriage of another, and is within the statute of frauds, Article 3995, Vernon's Ann.Tex.Civ.St. There is no finding as to whether there was any other implied agreement and none is established as a matter of law, but such would, if established, be unenforceable because of the statute of frauds.

The case of Hacker v. Whitney Dam Lumber & Construction Co., 225 S.W.2d 225 (Tex.Civ.App.), writ ref., is distinguishable because there the contract clearly was that the owner, at the time of the agreement, still owed the contractor enough to pay for additional materials and would pay out of such funds for the materials to thereafter be delivered.

The judgment of the Trial Court is reversed and judgment is rendered that the appellee take nothing.